```
 1                  UNITED STATES DISTRICT COURT

 2           WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3   _____

                                  )
 4   UNITED STATES OF AMERICA,     ) CR20-00143-JCC
                                   )
 5                  Plaintiff,     ) SEATTLE, WASHINGTON
                                   )
 6   v.                            ) May 24, 2021 -
                                   ) 9:00 a.m.
 7   DESMOND DAVID-PITTS,          )
                                   )
 8                  Defendant.     ) Sentencing Hearing
                                   )
 9   _____
                                   )

10
             VERBATIM REPORT OF PROCEEDINGS
11        BEFORE THE HONORABLE JOHN C. COUGHENOUR
                UNITED STATES DISTRICT JUDGE
12   _____

13

14   APPEARANCES:

15   For the Plaintiff:      Todd Greenberg
                             U.S. Attorney's Office
16                           700 Stewart Street
                             Suite 5220
17                           Seattle, WA  98101

18

19   For the Defendant:      Corey Endo
                             Federal Public Defender's Office
20                           1601 5th Avenue, Suite 700
                             Westlake Center Office Tower
21                           Seattle, WA  98101

22

23

24

25
```

Proceedings stenographically reported and transcript produced with computer-aided technology

```
 1        THE CLERK:  We are here on CR20-143-JCC, the United
 2   States of America versus Desmond David Pits.
 3      Counsel, please make your appearances for the record.
 4        MR. GREENBERG:  Good morning, Your Honor.  Todd
 5   Greenberg for the United States.
 6        MS. ENDO:  Good morning, Your Honor.  Corey Endo with
 7   Desmond David-Pitts, who's seated to my left.  And also with me
 8   at counsel table is Andrea Altheimer from Community Passageways.
 9        THE COURT:  I apologize for being late.  I have a good
10   excuse, but I won't bore you with it.  But if any one of you had
11   been late, I would have charged you $25.  It's only just that I
12   have made out a check just now for $25 to the Southern Poverty
13   Law Center.  I gave it to Gabe who will swear under oath that he
14   will see that it's sent to the Southern Poverty Law Center.
15        THE CLERK:  I so swear, Your Honor.
16        THE COURT:  All right.
17      So, has the defendant had an opportunity to review and
18   comment on the presentence report?
19        MS. ENDO:  Yes, he has, Your Honor.
20        THE COURT:  All right.  Do you wish to be heard?
21        MS. ENDO:  I do.  Thank you.
22      Good morning, Your Honor.  We are asking the Court to impose
23   a sentence of time served, followed by three years of supervised
24   release, with all of the conditions recommended by probation.  I
25   am confident that such a sentence is sufficient to achieve all of
```

1    the goals of sentencing, given the unique features of this case

2    and of Desmond David-Pitts.

3         This morning I want to focus on three of those:  how

4    exceptionally aberrational this conduct was, how impulsive it

5    was, and the enormous cost of incarceration for Desmond.

6         We know from Desmond's past that he is a person who values

7    peace, who values community, who values healing.  He created the

8    Go with the Flow event.  It was his own brainchild, dedicated to

9    the peaceful expression of emotion so that people could heal and

10   that communities could come together.

11              THE COURT:  His letter to me, did you edit that?

12              MS. ENDO:  Your Honor, he wrote the letter, and then I

13   helped him reorganize it to try to make it more readable for Your

14   Honor.  But it was his writing altogether.

15              THE COURT:  All right.

16              MS. ENDO:  And I think his letter speaks to his poetry

17   and really who he is as a person, and I would not wish to take

18   away from that at all with my boring legal writing.

19        Your Honor, his friend, Sydney Stokes, wrote to the Court

20   that he knew that what he saw on the video wasn't Desmond, that

21   it was "years of rage, sorrow, distress, pain, and frustration

22   coming out of him; that "this flower boy had cracked and is now

23   facing the consequences," and I think that "flower boy," that

24   person, is the true Desmond David-Pitts.  We saw his true self

25   after he was arrested.  He's not a person who posted to social

1  media or boasted about what he did but, instead, expressed

2  immediate remorse.  He has shown that genuine remorse

3  consistently since he was arrested, from his comments to the

4  officers, to his discussion with Ron Roesch, to really his

5  persistent interest in restorative justice, despite that effort

6  going nowhere at this point.  He still, even this morning, just

7  asked me again about whether that was a possibility.  And I think

8  it's important because I think it reflects who he is truly as a

9  person.  We see that person in what he has done to prepare for

10  his future, what he has done even while incarcerated at the FDC

11  under very difficult conditions.  He's reading Gandhi and Bryan

12  Stephenson.  He's focusing on his education and on

13  service-oriented work.

14          THE COURT:  Have you read Stephenson's book?

15          MS. ENDO:  I have.  I actually sent it to him.  And in

16  part because --

17          THE COURT:  Did you attend the bar association breakfast

18  where Mr. Stephenson spoke?

19          MS. ENDO:  I don't think I attended that one.

20          THE COURT:  It was extraordinarily powerful.

21          MS. ENDO:  Yeah.  I became a defense lawyer because of

22  Bryan Stephenson.  I had the chance to see him speak my first

23  week of law school, and he changed the course of my life.  And I

24  think part of what he teaches that's so valuable, that Desmond is

25  understanding, that Desmond is more than this act; that he does

1    not need to define himself.

2         THE COURT:  Mr. Greenberg, have you read Stephenson's

3    book?

4         MR. GREENBERG:  I have not, Your Honor.

5         THE COURT:  You should.  I sentence you to read it.

6         MS. ENDO:  I will send him a copy, Your Honor.

7         THE COURT:  Okay.

8         MS. ENDO:  It would be my pleasure.

9         MR. GREENBERG:  Thank you.

10        THE COURT:  And I want a one-page book report from you.

11        MS. ENDO:  So we see this true person.

12    And another way in which we know who Desmond is as a person

13    is his efforts with Community Passageways.  He regularly calls

14    Andrea to talk about the future, to think about what options are

15    available to him, how and when he can start going back to school.

16    And we see the true Desmond in the number of people who stand

17    by him -- from social service workers, to activists, to family

18    and friends.

19        THE COURT:  What do I say to the people who are appalled

20    by the level of violence that took place up on Capitol Hill, the

21    level of violence that is taking place at the federal courthouse

22    in Portland?  If I sentence him to time served, what's the

23    message to people who are thinking about engaging in that kind of

24    conduct?  They aren't tourists, by any stretch of the

25    imagination.  We're dealing with a very, very significant

1    problem.  Thank God we haven't had that problem with this

2    building, but we have with the old courthouse here in Seattle.

3        What do I say to the police officers who were inside that

4    building when the fire was set and the attempt was made to

5    blockade them in the building with quick-drying cement?  What do

6    I say to them if I give him time served?

7        MS. ENDO:  Your Honor, I think that the message is still

8    received, that those kinds of acts are taken very seriously.

9        Desmond's act, however, was one of impulsivity.  He is not

10   somebody who set out -- came to the protest to cause violence, to

11   engage in any acts, you know, under the cover of the protests.

12   He is truly somebody who was swept up in that moment, and so I

13   don't think we need to send this young person to prison.

14       I think if what we're concerned about is keeping the

15   community safe and working to rebuild trust, we don't do that by

16   sending Desmond to prison.  We do that by recognizing his youth,

17   we do that by recognizing his remorse, we do that by recognizing

18   the storm of circumstances that led him to engage in such an

19   impulsive act.

20       And I know he is incredibly sorry to those officers.  He

21   would like nothing more than to be able to apologize to them

22   face-to-face and would do so if given that opportunity.

23       Your Honor, I do want to just take a moment to acknowledge

24   all the folks on the line who include Emily Reimer from the

25   Covenant House, who wrote a letter to Your Honor -- most of these

1  people have written letters -- Nicole Stuemke, who is the

2  director of the homeless shelter where Desmond lived before he

3  came to Alaska -- or came to Seattle, excuse me; his friend,

4  Nyszel, who's a friend who inspired him to move here; His mother

5  is on the line; Claire Thornton, who's a member of the Community

6  Passageways Rebuild team, is here; as are many, many friends and

7  activists and supporters from Alaska, including many of the

8  family members of Daelyn.

9      So the impulsivity, this question of how impulsive this was,

10  I think is very important to assessing his culpability and what

11  punishment is necessary to impose on Desmond to send an

12  appropriate message.  We know from the offense that it was

13  impulsive.  He shows up -- he's not dressed in black.  He instead

14  has the pink camouflage pants on.  He didn't even have a lighter

15  when he started walking or arrived at the police station.

16  Instead, he gets swept up, and he gets swept up because of his

17  vulnerabilities.  He's vulnerable given his anxiety and how

18  overwhelmed he becomes in crowds; he was vulnerable given the

19  intensity of that historical moment, of that collective anguish

20  and grief over the killing of unarmed black men; he was

21  vulnerable given his questions about identity; he was vulnerable

22  given the foreignness of Seattle and the intensity of the

23  protests here; he was vulnerable given his grief for Daelyn's

24  death around his birthday; and he was vulnerable given his

25  youthfulness, which I think is also an important part of the

1    message that the Court sends, that we recognize that young people

2    are different.

3        Social scientists teach us this.  Courts have repeatedly said

4    so.  The Washington Supreme Court recently in its *Bartholomew*

5    decision recognizes people, young people, their brains are still

6    developing, and with that lack of a fully developed frontal

7    cortex, young adults, like Desmond, over 19 are more likely to

8    act on impulse.  It makes it harder for them to modulate their

9    emotional responses, to regulate their behavior, and that these

10   deficits are particularly pronounced when with peers, when with

11   groups of people.

12       And so I think given the uniquely impulsive nature of this

13   act, the Court need not send a deterrence message.  People like

14   Desmond are not going to think about the consequences imposed in

15   another case in those moments of vulnerability.  I don't think

16   that people would be deterred from committing such acts because

17   of the sentence Your Honor imposes today.

18       I think it's very different when it's organized people who go

19   places to commit acts of violence because those people make more

20   of a decision.  Desmond did not make such a decision.  I think if

21   he had had a moment's thought about what he was doing, he would

22   have made a different decision, and he is deeply remorseful for

23   the fact that he didn't take that time to think, that he allowed

24   himself to get swept up in that moment.

25       Your Honor, the last thing I want to talk about is the

1  exceptional cost of prison for a person like Desmond.  He's

2  vulnerable on multiple dimensions.  As a mixed-race person in a

3  race-oriented institution, he is vulnerable; as a bisexual person

4  in a homophobic institution, he is vulnerable; and as a young

5  person in an institution meant for adults, he is vulnerable.

6      In preparing for this case, I learned that less than one

7  percent of people incarcerated in the BOP are 21 years old or

8  younger.  It's simply not an institution built for somebody like

9  Desmond.  And social scientists and people involved in criminal

10  justice reform think there should actually be a separate system

11  for people who are 18, 19, 20, 21 years old because it's so

12  ill-suited for someone like Desmond.  He is more likely to

13  experience abuse, people like him are more likely to attempt

14  suicide, to suffer violence and trauma in prison.  But I think

15  maybe most importantly is that the focus of those institutions is

16  misplaced, that the progress he needs to make from being a 19- or

17  20-year-old to a full-fledged adult is progress that does not

18  happen in prison, it does not happen in a place where people are

19  not able to develop prosocial relationships, to see the value of

20  hard work, to make independent decisions.  I think what's maybe

21  most frightening for me is what Nancy Gertner writes in her

22  article, which is that it's not just delaying that progress, it's

23  derailing it, it has the potential to completely change the

24  course of his life.  And given who Desmond is, given where his

25  head is now, given the community that's supporting him, given the

1   opportunities that Community Passageways offers, it's simply not

2   a cost that is necessary here.  So we are asking the Court to

3   impose a sentence of time served.

4        Your Honor, I know Ms. Altheimer would like to address the

5   Court and any questions Your Honor might have about their

6   program, as would Desmond.

7                THE COURT:  Okay.

8                MS. ENDO:  Would you like Ms. Altheimer to approach?

9                THE COURT:  Yes.

10               MS. ALTHEIMER:  Good morning, Your Honor.

11               THE COURT:  Good morning.

12               MS. ALTHEIMER:  I thank you for this time to speak on

13  behalf of Mr. Desmond Pitts.

14       I have spoken with Desmond since September of last year when

15  he was referred to our program.  I am a community

16  ambassador/mentor, as well as the lead, the director of the

17  reentry program.

18       I know firsthand what it takes to be successful upon release,

19  and I know that one of the instruments that was instrumental for

20  myself was community.  Desmond, from day one, was openly sharing

21  his feelings about his actions on the day of the crime that was

22  committed, and he was very remorseful and wanted to know how he

23  can get involved with restorative justice.  And he, like he just

24  shared, was very interested in making his apologies to those that

25  he offended on that day, hence, the police officers that were

1    involved.  I thought myself that that was very admirable,

2    especially for a young man wanting to make his penance to the

3    police officers and to right his wrongs.

4        I asked Desmond several questions.  I wanted to better

5    understand how he arrived on that day in committing the crime,

6    and he clearly spoke of just being caught up in the nostalgia of

7    what was going on.  He arrived downtown, wanting to support this

8    protest because of what it represented at the time, but then,

9    clearly, it went left with some of the others and he kind of got

10   caught up, not coming, as Corey explained, to cause destruction,

11   as that wasn't his plan, but just found himself caught up.

12       So I asked him a question:  What does the next chapter of his

13   life look like, right?  Tell me more about who Desmond is and

14   what it is that he wanted to do with his life.  And he actually

15   said that he really wants to do restorative justice, he wants to

16   become an attorney, he wants to return to school.  He has his

17   high school diploma and a GED, which is uncommon with our youth

18   today.  They either have either/or.  But he wants to pursue

19   education.  He's really family oriented.  He knows I'm watching

20   him.  As he's sitting there now, he has a picture of his family,

21   his mother and his siblings, and he's holding them dear.  It's

22   something that he is missing, right.

23       There have been some disruptions in his life, so I asked him:

24   How can we correct your course in that way?  We do offer housing

25   and employment and mentorship as well as training through our

1  program, and he's interested in all of those things.  And I asked
2  him:  So what is your plan as far as housing, upon reentering
3  back into the community?  And he went as far to say that he
4  doesn't mind if he even has to go into transitional housing.  He
5  wants to start and build his life back up, but he wants to make a
6  difference in his community and also wants to do speaking
7  engagements and speak to other youth to talk to them about being
8  caught up in this nostalgia and not so much being in the wrong
9  place, you know, and getting caught up, but being mindful that
10 there are consequences for your actions.  He has spent his time
11 in jail thinking about his future and thinking about ways to give
12 back to the community and to restore his wrongs with those that
13 were the justice system, those which were offended by this.
14      I haven't heard any blaming of anyone else, through Desmond,
15 the whole time that I have been speaking with him over seven
16 months, right?  He has taken full ownership.  He just wants to
17 come out and start over and give back in a way that is effective
18 to others.  And we connected him with Polly Davis with
19 Restorative Justice in King County, Dispute Resolution, because
20 he wants to be able to teach, to learn about the mentorship
21 program and mediation, and then he wants to teach the youth that
22 we're working with.  We're working with youth in the south end of
23 King County, and they are the youth that have found themselves in
24 spaces of committing crimes and things like that, right?  And he
25 wants to be able to mentor them as well so that they're not

1  ending up in a federal courthouse or that they're not potentially

2  looking at a prison sentence.  So he wants to interrupt that

3  cycle before it happens.  He also wants to teach other people

4  what it looks like to take responsibility for their actions fully

5  and then move forward in such a way that you can imagine your

6  life productively, right?

7      He has had a fragmented life.  Corey shared some of his

8  story.  But he's not staying there, right?  He's imagined a life

9  that is full and full of potential and actually being in a space

10 to where he can be a contributing member to the community, of the

11 community of Passageways.  We want to help him with that process.

12     Upon his release, I am willing to help him and ready to help

13 him with housing, with employment, employment training, and with

14 him to continue with his mental health services, right?  We have

15 the restorative justice.  We have the education piece.  We have

16 it all set up for him.  The only thing that we don't have is a

17 start date.  But all the pieces are in place for him.  I have

18 made several contacts for Desmond, and they're ready and willing

19 to help him also with open arms, given the opportunity.

20     My hope is today that Desmond does end up with the shorter

21 end of his sentence so that he doesn't have to enter into the

22 penal system and become engulfed with whatever happens in there

23 to young men, with the things that Corey explained for Desmond.

24     I myself spent 21 years in prison.  I watched the population

25 become younger and younger, and I watched those young individuals

1    become preyed upon in the institution.  And it's just not a place

2    for young individuals.  I believe that he can be more productive

3    out here in the community, surrounded with those that can mentor

4    him and guide him into a more productive life.  And that is what

5    I am willing to offer Mr. Pitts, given the opportunity, as well

6    as our whole team at Community Passageways.

7         Thank you.

8              THE COURT:  All right.  Thank you.

9         Good morning, Mr. David-Pitts.

10             THE DEFENDANT:  Good morning.

11        How are you doing, sir?

12             THE COURT:  Just fine.

13        Take your mask off.  I want to look at you when you're

14   communicating.

15        Okay.  Go ahead.

16             THE DEFENDANT:  The question I asked Corey earlier is:

17   What do you say to the people that think that what I did was bad?

18   And it was really bad.  But what I think you should say is:  I

19   don't got no excuses for what I did.  I messed up.  I was young

20   and stupid and impulsive, and I had no right to do what I did.

21   And if I had the chance to make up for it, I would, but I can't

22   turn back time.  So the only thing I can do is plan for the

23   future.

24        Bryan Stevenson says that we are better than the things that

25   we have done in the past, and I think that's really true.  And he

1   also says that we should proceed in judging people with

2   compassion and mercy.  I know I can't expect it from you and I

3   don't -- because I know the actions I performed were not out of

4   mercy in that moment, in that impulsive moment, for the people in

5   that building.  And if I ever got the chance -- which I hope,

6   through restorative justice, I do -- I can apologize

7   face-to-face, and maybe even to the families, because that's not

8   really what I wanted to do.

9       I have this saying:  If we come together with compassion and

10  peace -- if we come together with compassion and love and peace,

11  it's possible.  And I am a strong believer in that.  I just kind

12  of was hypocritical and I acted on impulse in my grief, in my

13  anger, and I should have never done that.

14      In the past nine months, every day, I have stayed awake

15  thinking about what I was going to say to you and how I was going

16  to say it, and most of the time it just came to the same thing:

17  I really messed up, and I can't take that back.

18      So what I plan -- My mom, I never really had a relationship

19  with her, and she moved here with my family, and I'm going to

20  help take care of my brothers and teach them right from wrong.

21  They never had a real role model, and I never really did either.

22  I want to be that for them.

23      My brother, Daelyn Polu -- he's my chosen brother; I have

24  known him for a while -- he got shot by the police.  I got pulled

25  over by the police officer that killed him.  The only thing that

1   I said, I said:  I thank you for not shooting me and I hope that

2   you drive safe home.  Because I don't want him dead.  I don't

3   want him hurt.  I want him just held accountable.  And that's why

4   when I went to officers, when I got arrested, I admitted to them.

5   Because I can't be a man if I don't hold myself accountable for

6   my own actions, and I can't expect others to.  So that's why,

7   with whatever you do give me, I would appreciate it if you would

8   give me good time.

9       Maybe one day I will able to tell them all this, the police

10  officers in that building, but if I never get the chance, I hope

11  that at least the effort.  I have a lot of things that I want to

12  do with my life.  I had the Go with the Flow.  I had been

13  planning to turn it into a nonprofit for youth around the United

14  States, but I have to start small.  But I want to be able to give

15  them a voice themselves so that way they don't have to end up in

16  the streets and doing things that me and the other kids are doing

17  because they're impulsive.  I want to give them the strategies

18  and the tools to build their mental -- minds.  That way they can

19  think about it and not actually act impulsively.  Because all

20  they do is, kids my age or people my age, they don't really

21  think.  For me -- that's why I'm here -- it's terrifying.

22      I actually write poetry, and I want to write a poetry book so

23  that way I can start a fund for homeless shelters because I was

24  homeless before this.  And most of the kids from 10 to 21 are

25  smoking meth in Alaska, and I don't like that statistic, but

1   there's nothing I can do about it besides try.  I really want to

2   do that restorative justice, but I know that I can't until I'm on

3   my own, which is a setback.  But, either way, I'm going to do it

4   because I really do want to meet those police officers

5   face-to-face and let them know that I messed up.  I can't let

6   stupidity and anger dictate my emotions no more.  That's why I've

7   been taking my medication for my PTSD, I've been going to meet

8   the counselors at SeaTac, and I have been reading Gandhi.  Gandhi

9   says if want to be a good man, you have to handle your life with

10  care.  So that's what I have been doing every moment, every

11  minute.  Started working out so my body can get better.  I have a

12  heart problem which hasn't been taken care of, but I have made

13  sure that my mind, my body, and soul are at the same level, and I

14  know that I can grow.  It's just I need the opportunity and the

15  chance, and I know that holds in your hand.  So whatever happens,

16  happens.  You reap what you sow.  I was acting really retarded --

17  I mean, stupid.  Sorry.

18      I wrote a poem.  It didn't get submitted in your letter,

19  but ... Humiliation is of itself the very essence of humanity.

20  One who denies making mistakes hides behind his lies and his own

21  delusion.  Truth comes from the accountability we must embrace

22  when facing our shortcomings.  Wrongs, failure, and mistakes have

23  purpose only when acknowledged.  It's fate to fall in order for

24  God to see how we get up.  Humiliation is key for one to change.

25      We all make mistakes.  And I made a mistake, a bad one at

1   that, and I can't take it back, but through the humiliation,

2   through the accountability, through the embrace and compassion

3   and love that I can show others, and hopefully others can show

4   me, I can make a difference, but I just need time to prove it.

5            THE COURT:  Have you had any difficulty at SeaTac?

6            THE DEFENDANT:  They call me a little fag.  But, no, not

7   really.

8            THE COURT:  Have you been in isolation?

9            THE DEFENDANT:  No, sir.

10           THE COURT:  Okay.

11           THE DEFENDANT:  I stay in my cell and I read books.

12           THE COURT:  Have you been assaulted?

13           THE DEFENDANT:  No, sir.

14           THE COURT:  Okay.  If you encounter any difficulty,

15   your law clerk -- or your lawyer will give you my telephone

16   number.  You can call me collect from the facility, if you have

17   problems, and you can tell me about them, and I will even get

18   involved, okay?

19           THE DEFENDANT:  Yes, sir.

20           THE COURT:  All right.

21      Mr. Greenberg.

22      Let me start by saying thank you for not charging this as a

23   mandatory minimum case.  It shows your stature as an Assistant

24   U.S. Attorney is tempered by compassion, and the Court

25   appreciates it.

1          MR. GREENBERG:  Yes, Your Honor.  I appreciate that as

2     well, as does my office.  Thank you.

3          This, like many cases, Your Honor, at the time of sentencing,

4     is a balancing act.  It's a balancing between various factors,

5     often competing, just like in this case.  We have an offense

6     conduct that is extremely serious, we have a defendant with a

7     background that is very mitigating, and we have, I believe, a

8     strong need for general deterrence to be factored into the

9     Court's sentence.

10          As the Court noted, we did charge this in a way to leave the

11     sentence to the Court's discretion.  Not only did we drop the

12     mandatory minimum, but we did not attempt to negotiate a floor to

13     the defendant's recommendation.  You know, we left this to the

14     Court's discretion.

15          That being said, from the government's view, the sentencing

16     guideline range is very appropriate for this case, and we're

17     recommending a sentence at the high end of that, as the Court

18     knows, of 46 months.

19          The word "impulsive" has been used many times this morning,

20     and I think we need to break that down a little bit.  There may

21     be some aspect of impulsivity to this conduct, but just

22     describing it as "impulsive," I think, minimizes the conduct

23     here.

24          This isn't the type of situation where someone showed up at a

25     protest, stood by the side, and then got worked up and smashed a

1   window of a police car and walked away.  That's a very impulsive

2   short, quick act.  This isn't even a situation where someone was

3   at a protest and another person handed them a Molotov cocktail

4   and they threw it and then walked away.  That act would take just

5   a few seconds, and it's serious, but it's very impulsive.

6       Here, the defendant participated in a conspiracy with a group

7   of people that he associated with throughout the night.  He

8   attended the protest with these people.  He walked around all

9   night with these people, he interacted with them, and his

10  criminal activities were coordinated with them.  Those

11  activities, in terms of setting the fire, took at least 14

12  minutes.  And that's just from the start of the fire, not walking

13  around and talking with everyone, doing whatever they did in

14  terms of planning, which we'll never know.

15      "Impulsive" is a word, and people can use it in different

16  ways, but I think the length of time and the nature of the

17  overall conduct here makes me feel like the word "impulsive"

18  discounts the seriousness of this to a degree.

19          THE COURT:  On the other hand, if he was really

20  conspiring with these other folks, it kind of begs the question

21  of why he would have worn pink camouflage pants and no face mask.

22          MR. GREENBERG:  Yeah.  Yes.  And that's a fair point.

23  And I don't want to overstate the degree to which, you know, he

24  was a member of this group.  I mean, this group was in a

25  different place than the defendant.  They clearly showed up at

1   this protest dressed for what they did.  The defendant did not.

2   We're the first to acknowledge that.  But, nonetheless, he fell

3   in with that group, he walked to the different precincts with

4   that group, he interacted with that group, and then he committed

5   the crimes with that group.  And so, yes, he may not have, you

6   know, dressed for that kind of conduct, and maybe didn't even

7   think he participated until that night -- and I would be

8   perfectly willing to believe that -- but it's not like he just

9   snapped at a moment's notice and did one thing and walked away.

10  This was something that lasted throughout the night, and he knew

11  full well what he was getting into and what this group was about

12  and participated in it.  So that's the point I'm trying to make.

13      The Court's comments earlier about the officers inside the

14  precinct, you know, I understand this Court has a full

15  understanding of how serious this is, and I am not going to just

16  sit up here and pound on the podium and restate that all.  But I

17  do want to state two things.  First of all, this was a

18  coordinated effort by this group, and Mr. David-Pitts, like it or

19  not, was a key part of the activities that were going on.  There

20  were three things going on all at the same time during this

21  14-minute period.  One was this fire that the defendant set.  A

22  couple of the other folks helped him do it, but, really, he did

23  almost all of that himself, in the sally port against a garage

24  door.  The others that tried to barricade the door shut in the

25  ways this Court has acknowledged were part of this same group,

1    some of the same people that he attended the protest with.  He

2    didn't do that himself.  And then the others in the group around

3    the corner set the second fire while the defendant was setting

4    his fire.  And although he didn't set the second fire, he helped

5    them break through the fence.  There was a protective fence

6    outside of the precinct.  He helped them cut through the fence so

7    they could access that area and set the fire.  So a very serious

8    and coordinated situation.

9        And the other thing that just stood out to me so starkly

10   when I first saw this surveillance video probably the next

11   morning was that there was no question that this particular

12   person, Mr. David-Pitts, knew there were officers in the

13   precinct.  I mean, there was some talk about, well, precincts

14   were abandoned at some point, you know, in time in the city this

15   summer.  He knew there were people in there because the officers

16   tried to exit through that door as the defendant was setting the

17   fire, and he picked up a bottle and threw it against the door,

18   and they shut the door, they kind of retreated in as the bottle

19   smashed, and then set the fire.  To me, that, you know, really

20   speaks volumes about the seriousness of the conduct.  And

21   impulsive or not, you know, for the next ten minutes, he

22   continued on with it.

23        THE COURT:  You know, I kind of identify with what the

24   officers inside the precinct were thinking at the time.  I have

25   been in a situation like that.  I happened to be in New Delhi

1    when Mrs. Gandhi was assassinated, and I was barricaded in a

2    hotel while rioting and gunshots and cars were set afire right

3    outside my window of my hotel room.  The feeling of helplessness

4    and the terror that I experienced there has to be similar to what

5    was going on inside that precinct.  There weren't enough officers

6    inside that precinct to solve the problem.  All they could do was

7    hunker down and pray for the best.  We shouldn't ask our law

8    enforcement officers to endure that sort of thing, it's not

9    right, and it can't be lost sight of in this sentencing.

10           MR. GREENBERG:  Yes, Your Honor.  You said it better

11   than I could.

12       The other aspect of the conduct that I find to be an

13   aggravating factor here -- and this, I guess, goes both to the

14   nature and seriousness of the offense but also the need for

15   general deterrence -- is the environment in which this crime was

16   committed.  All summer long, and even since then, we have seen

17   these protests in Seattle and everywhere, and they're important

18   protests and they're important issues, and they are issues that

19   the defendant says -- and I credit because of his history -- are

20   important to him.  Most of the people at these protests are

21   law-abiding, they're there to protest, to speak out for important

22   causes, and it's a small group of people, on August 24th,

23   including this defendant, who take advantage of that environment,

24   who use the cover of that environment to commit acts of violence.

25           THE COURT:  You know, the other thing that occurs to me

1   is they do tremendous disservice to the movement, the BLM

2   movement, for example.

3          MR. GREENBERG:  Absolutely.

4          THE COURT:  It gives fodder to those who think that the

5   BLM movement is a terrible thing, and they point to what happened

6   up on Capitol Hill or at the courthouse in Portland and say,

7   "Looky there."  I mean, that's what happens when you listen to

8   these people.

9          MR. GREENBERG:  And that was the very next thing I was

10  going to say, Your Honor.  It does do that.  And it also does

11  that -- I mean, it does that in a variety of ways, but one of the

12  ways it does that is because the indelible images of these

13  protests have often been, you know, fires at police stations,

14  burning police cars.  Instead of waking up and looking at the

15  newspaper and seeing, you know, on May 30th, in downtown Seattle,

16  there were thousands of people that were protesting, you know,

17  these events and the cause that they were protesting, people wake

18  up and they see smoke billowing through downtown.  And that's

19  what they think about when they think of these protests.  It's

20  not all because of just Mr. David-Pitts.  There were many people

21  across the country and in Seattle who have done the same thing,

22  but he's one of them.

23      And this is one of those cases.  And there aren't that many

24  of these cases.  I disagree with Ms. Endo that there isn't an

25  important message of general deterrence that will be sent by this

1   Court's sentence.  I think that there will be.  We have seen what

2   happened here, in Portland, in the nation's capitol.  I mean,

3   different ideological spectrums.  There are protests that are

4   going on.  The times we live in, that's not going to change any

5   time soon.  It could happen tomorrow, next month, next year, who

6   knows.  But people are paying attention to these protests, to

7   these crimes that happen at the protests, and to the sentences

8   that people are receiving, and so I do think that that's an

9   important part of the Court's sentence.

10      All of that is obviously being balanced by the defendant's

11   personal background and characteristics, which contain many

12   mitigating factors, and the government is the first one to

13   acknowledge that.  We acknowledged it through our plea agreement,

14   and we acknowledge it today at sentencing.  And so, you know,

15   that's the balancing that I know this Court will engage in.

16          THE COURT:  On a scale of one to ten, how would you

17   judge his remorse?

18          MR. GREENBERG:  I don't know him.  The reason I'm

19   struggling is because, on its face, I think it would be an eight

20   or nine, if he's genuine.  If he's being genuine, if his words

21   are genuine, then yes.

22      This Court has seen many a sentencing when defendants have

23   that motivation to say all the right things, and it's not always

24   genuine.

25          THE COURT:  At least he hasn't told me he's got

 1    religion.

 2            MR. GREENBERG:  That's true.

 3        And so that's what I'm balancing.  I just don't know him well

 4    enough.  I'm not suggesting that it's not sincere, but it's hard

 5    for me to fully credit that.

 6            THE COURT:  On a scale of one to ten --

 7            MR. GREENBERG:  Yes.

 8            THE COURT:  -- how do you judge the quality of his

 9    letter to me?

10            MR. GREENBERG:  High.  I thought it was a thoughtful

11    letter.

12            THE COURT:  It's one of the best I've seen in 40 years.

13            MR. GREENBERG:  Yeah, I thought it was a thoughtful

14    letter.  And he's a thoughtful person.  I mean, I can say that,

15    you know, just based on what I have seen and what I know about

16    his past.  You know, I guess it's mitigating in general.  It also

17    cuts both ways because, I mean, he has an understanding of these

18    issues.  It's not like he's someone who just showed up at the

19    protests, you know, without really understanding the cause.  He

20    does understand this cause, and it seems like it means a lot to

21    him.  And the fact that he would be one of those people that then

22    undermine it so seriously in the way that he did is -- you know,

23    again, it's hard to fathom, and I think that it's something to

24    consider in terms of imposing a sentence.

25        And so before I conclude, Your Honor, just one ministerial

 1   thing, which is the issue of restitution.  The parties are going

 2   to ask the Court to set a restitution hearing.  The reason is we

 3   only on Friday received the documentation from the Seattle Police

 4   Department about the restitution amount.  I sent that to Ms.

 5   Endo, but I don't think she's had sufficient time to discuss it

 6   with Mr. David-Pitts.  And so we're hoping to come to an

 7   agreement, but if the Court could set that in the future, we

 8   would appreciate it.

 9           THE COURT:  How far out do you want it?

10           MR. GREENBERG:  I think just 30 days should be plenty.

11           THE COURT:  Give me a date, Gabe.  Gabe?

12           THE CLERK:  One moment, Your Honor.

13           THE COURT:  Oh.

14           THE CLERK:  We could go with June the 28th, Your Honor.

15           THE COURT:  Does that work?

16           MR. GREENBERG:  Yes, Your Honor.

17           MS. ENDO:  Thank you, Your Honor.

18           THE COURT:  Okay.

19           MR. GREENBERG:  Thank you, Your Honor.

20       And just to conclude, the government has balanced all of

21   these factors.  We believe a sentence of 46 months is the

22   appropriate sentence here.

23           THE COURT:  All right.  I find the total offense level

24   is 21, the criminal history category is one, which gives a

25   guideline range of 37 to 46 months.

1    I'm imposing a period of confinement of 20 months and a

2    period of supervised release of three years, subject to the

3    standard conditions, together with those additional conditions

4    set forth in the presentence report.

5    This sentence is a product of the guidelines, together with

6    the factors of 18 U.S.C., Section 3553, with particular emphasis

7    on the fact that the government could have charged this case as a

8    mandatory minimum five-year case, the fact that the defendant had

9    a difficult childhood and endured more than most young people

10   should ever have to endure, considerable emphasis on the

11   avoidance of disparity, because there are other people that I'm

12   going to have to be sentencing regarding these events, and the

13   fact that I have considered the defendant's remorse to be

14   genuine, and that his youth is a serious factor to be considered

15   in fixing this sentence.

16   I think that, on the other hand, that if I had imposed a

17   sentence of time served, it would not have been understood by the

18   community and by other people who are thinking about committing

19   this sort of conduct.  And as much as I would have liked to have

20   turned him loose today, I just think it would have been

21   irresponsible on my part to do so.  I think 20 months strikes a

22   balance between this effort to recognize his youth and the

23   difficult childhood he's endured, but also takes into

24   consideration the seriousness of these events.

25   Mr. David-Pitts, one last thing I would like to say to you,

1  and that is, I think you should do whatever you can to further

2  your education.

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  I seldom see as much potential

5  intellectually in the written work that they submit for a

6  sentencing, and it would be a terrible waste, in my mind, if you

7  don't pursue higher education.

8              THE DEFENDANT:  Yes, sir.

9              THE COURT:  If I can be of any help to you in that

10  regard, I will do it.  As I said earlier, if you encounter

11  difficulty in serving this period of time, you call me, and I

12  will get involved, okay?

13              THE DEFENDANT:  Yes, sir.

14              THE COURT:  You have waived the right to appeal this

15  sentence except in very limited circumstances.  If you wish to

16  file a notice of appeal, it must be filed within 14 days of

17  today.  If you wish the assistance of an attorney in filing a

18  notice of appeal and cannot afford one, one will be appointed to

19  assist you if you so request.  If you wish the assistance of the

20  clerk in filing a notice of appeal, he will assist you if you so

21  request.  Do you understand?

22              THE DEFENDANT:  Yes, sir.

23              THE COURT:  All right.  Anything further, counsel?

24              MR. GREENBERG:  No, Your Honor.  I have a judgment that

25  we will hand up.  I will let Ms. Endo review it.

 1          MS. ENDO:  Your Honor, can we add a placement

 2    recommendation for Sheridan?

 3          THE COURT:  Yes.

 4          MS. ENDO:  Thank you, Your Honor.

 5       May I approach?

 6       And, Your Honor, I have reviewed the judgment and believe

 7    it's consistent with your ruling.

 8          THE COURT:  All right.  Thank you, counsel.

 9          MS. ENDO:  Thank you, Your Honor.

10          THE DEFENDANT:  I hope you have a good day, sir.  Thank

11    you for your attention and time.

12

13                    (Adjourned.)

14

15              C E R T I F I C A T E

16

17       I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

18    United States District Court in the Western District of

19    Washington at Seattle, do certify that the foregoing is a correct

20    transcript, to the best of my ability, from the record of

21    proceedings in the above-entitled matter.

22

23                    /s/ Nickoline Drury

24                    Nickoline Drury

25